UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NIGEL HURST,
    Plaintiff,

v.      3:08-cv-1422 (CFD)

CONOPCO, INC. d/b/a UNILEVER
HOME AND PERSONAL CARE NORTH
AMERICA, UNILEVER N.V., and
UNILEVER PLC,
    Defendants.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Nigel Hurst, brought this action alleging breach of contract and breach of the covenant of good faith and fair dealing concerning reimbursement of certain expenses arising from his termination of employment by the defendant Conopco, Inc. ("Conopco").[1] Conopco has filed a motion for summary judgment as to both of Hurst's claims. In the alternative, Conopco also moves for partial summary judgment limiting Hurst's damages, if any.[2] Hurst opposes Conopco's motion and cross-moves for summary judgment on the issue of liability. For the reasons that follow, Conopco's motion for summary judgment is granted in part and denied in part and Hurst's cross-motion for summary judgment is denied.

---

[1] Hurst originally brought several other causes of action in his original Complaint, including fraud, negligent misrepresentation, and promissory estoppel; however, Hurst's Amended Complaint only includes two causes of action—breach of contract and breach of the covenant of good faith and fair dealing.

[2] Conopco's motion for partial summary judgment is based on Conopco's Fifth Affirmative Defense—mitigation of damages.

## I. Factual Background[3]

Nigel Hurst was employed by affiliates of Conopco for thirty-two years as a human resources professional. Conopco provides nutrition, hygiene, and personal care products under well-recognized brands, including Dove, Vaseline, Suave, and Lipton. This case concerns whether Conopco is responsible to Hurst for the brokerage fees and related closing costs for the sale of his home in Stamford, Connecticut, following his termination from Conopco.

Prior to 1999, Hurst worked on assignment for a Conopco affiliate in Singapore, China.[4] In 1999, Hurst was relocated from Singapore to the United States, where Hurst then worked as Senior Vice President of Human Resources for Unilever Home and Personal Care North America (a division of Conopco) and Unilever United States (collectively, "Unilever").

As a result of Hurst's relocation to the United States, Unilever, pursuant to a September 1, 1999 letter from Charles B. Strauss, President of Unilever, agreed to reimburse Hurst for certain expenses relating to his purchase of a home, including the cost of his real estate broker's commission, and extended him a $350,000 loan to help facilitate the purchase of the home. On November 23, 1999, Hurst and his future wife, Janice Waterman,[5] purchased a home in Stamford, Connecticut, for $1.1 million. Hurst was fully reimbursed for all of the related expenses pursuant to Strauss's September 1999 letter. In addition, Hurst received an April 13,

---

[3] The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties, including depositions. They are undisputed unless otherwise indicated.

[4] Hurst is a United Kingdom citizen. He is referred to frequently in a number of documents as an "expatriate" or "expat."

[5] Hurst and Waterman married in October 2000.

2000, letter from Strauss that stated that Unilever would protect him from a decline in the sale price of his newly-purchased Connecticut home by providing a guaranteed sale price of $1.1 million for his home until November 30, 2004.

On November 26, 2003, Hurst and Waterman purchased a second home in Stamford for approximately $1.9 million. Subsequently, on December 1, 2003, Hurst and Waterman sold their original Stamford home (the home purchased in November 1999) for $1.585 million. Hurst did not receive any reimbursement from Unilever for any of the costs associated with the sale of his original Stamford home or the purchase of the second Stamford home.[6] In addition to their Stamford home, Hurst and Waterman also purchased a home in Westport, Connecticut for $1.155 million in January 2004.

In November 2004, Unilever Human Resources Director Andre van Heemstra informed Hurst that Unilever would be transitioning to a new organizational structure and that Hurst would likely be terminated by December 31, 2005. Consequently, van Heemstra told Hurst that a separation agreement between Unilever and Hurst would be negotiated. On November 14, 2004, Hurst sent a letter to van Heemstra that included, among other things, Hurst's proposed terms for his severance agreement with Unilever. Of particular importance, Hurst requested that upon his termination he receive "[s]tandard policy relocation costs to the UK or any location on mainland US, or payment in lieu at my option." By letter dated December 17, 2004, van Heemstra responded to Hurst's November 14 letter. In van Heemstra's December 17 letter, van Heemstra noted that, with respect to "Relocation," Unilever was willing to make an exception to its

---

[6] Hurst never claimed that he was entitled to reimbursement for either the sale or purchase of these homes because it was a personal and voluntary move (as opposed to a work-related move).

standard policy relocation rules and provide Hurst with relocation costs for relocation to either the UK or the United States.[7] Van Heemstra subsequently informed Hurst that he was relinquishing his role as Human Resources Director.

On February 17, 2005, Harish Manwani, President of Conopco's Home and Personal Care business, informed Hurst that his employment was being terminated. On that same day, Sandy Ogg, Chief of Human Resources at Unilever, gave Hurst an initial draft of a proposed severance agreement for his review. From February 18, 2005, to April 6, 2005, Hurst negotiated certain modifications to the proposed severance agreement with Ogg. On April 6, 2005, Hurst and Unilever signed and entered into a severance agreement (the "Severance Agreement"). The Severance Agreement provided all of the terms of Hurst's severance from Unilever, including his termination date of June 15, 2005.[8] Of particular importance to this litigation, Paragraph 11 of the Severance Agreement provided the terms for the reimbursement of Hurst's relocation:

> Any reimbursable expenses which you have incurred on behalf of Unilever for T&E or otherwise will be paid as soon as practicable upon receipt of reasonable detailed supporting documentation. If you relocate to the United Kingdom or within the United States within three years of your Termination Date, the Company will pay for or reimburse you for the actual cost of your household move pursuant to Company policy, up to a maximum of the cost associated with a move to the United Kingdom, upon submission of reasonably detailed supporting documentation. In addition, if you relocate to the United Kingdom or within the

---

[7] According to van Heemstra's letter, Unilever's standard relocation policy would "normally cover only relocation back to the home country [the U.K.]."

[8] Among other terms, the Severance Agreement provided Hurst with two lump sum payments, totaling $2,268,300, less withholding and applicable payroll deductions, and less the $350,000 housing loan previously extended to Hurst in 1999. The Severance Agreement also provided Hurst with immediate vesting of his stock options, as well as other payments and financial-related services (e.g., tax preparation services). These terms are no disputed in this case.

United States within three years of your Termination Date, the Company will pay you a Retransfer Allowance in accordance with the terms of your expatriate letter.

Around June or July 2005, Hurst and Waterman considered whether to relocate from Stamford for purposes of providing better schooling for their children and for securing a better long-term real estate investment; however, Hurst and Waterman ultimately decided to wait until Hurst's new job search was completed. After Hurst accepted a new job in Connecticut in July or August 2006, Hurst and Waterman decided to move to and permanently reside in their home in Westport, Connecticut (they believed Westport schools provided a better education for their children than those in Stamford); however, Hurst and Waterman chose to wait until spring 2007 to put their Stamford home on the market.

On April 18, 2007, Hurst sent an email to Thomas Navarra, Unilever Director of Human Resources. In the letter, Hurst wrote: "We will be putting our house on the market in the near future and plan to use the same realtors we used for our previous house sale. They have a 6% commission. Can you confirm that this is within the guidelines?" Upon receiving Hurst's letter, Navarra called Unilever's relocation team and inquired as to the maximum commission Unilever could provide on a home sale—Navarra was informed that the maximum commission was 6%. Navarra responded to Hurst via email on April 18, 2007, stating: "Policy allows up to 6%, so you are OK. Send me your closing statement when the move is complete and we will reimburse."

On May 10, 2007, Hurst and Waterman listed their Stamford home for sale for $2,685,000. Then, on May 17, 2007, Hurst sent Navarra another email. In that email, Hurst wrote: "Can you fax or pdf a copy of the household relocation policy as referenced in my severance letter. . . . The market is very slow on our existing property and there is a house that we

would like to make an offer on." On May 18, 2007, Navarra sent Hurst an email and attached the "Current Employee Relocation Policy," which was effective January 1, 2006 (the "January 2006 Relocation Policy"). That January 2006 Relocation Policy provided, in relevant part, that Unilever "will pay for the packing, shipment, and unpacking, [and] will also provide insurance coverage of household goods during the time of possession by the moving company."

On May 20, 2007, a third party made a $2.4 million "firm offer" on Hurst's Stamford home. On May 24, 2007, Hurst sent Ogg an email, which stated, in relevant part: "[W]e requested a copy of the household move policy for Level 5 expatriates relevant at the time of my termination. Tom [Navarra] sent me a policy which only covers movement of household goods. I am sure he made a misinformed mistake." On June 1, 2007, Navarra responded to Hurst's May 24 email, stating: "Please be advised that, under the terms of paragraph 11 of your Agreement and General Release, Unilever will pay for or reimburse you for the actual cost of your household move within the United States. Therefore, Unilever's coverage is limited to the physical move of your household effects as outlined in the attached document."

Hurst claims that as a result of Unilever's indication that it would not cover the six percent brokerage fee on the anticipated sale of his Stamford home, which would have totaled approximately $144,000 (plus additional closing costs), he and Waterman did not accept the $2.4 million offer. Then, in August 2007, Waterman unsuccessfully tried to resurrect a deal with the prospective purchaser who previously had made the $2.4 million offer. Hurst and Waterman removed their Stamford home from the market on October 31, 2007, and relisted it on April 7, 2008. On April 15, 2010, Hurst and Waterman closed on the sale of their Stamford home for $1.7 million, and subsequently moved to their Westport house.

Hurst claims damages in this action concerning the brokerage fee for the April 2010 sale of his Stamford home, as well as the reduction in sale price from $2.4 million to $1.7 million.

## II. Discussion

### A. Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the non-moving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000). "When reasonable persons, applying the proper legal

standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

B.   Breach of Contract

Conopco has moved for summary judgment on Hurst's breach of contract claim on two grounds: (1) Conopco argues that Paragraph 11 of the Severance Agreement does not include reimbursement for brokerage fees and other related closing costs; and (2) Conopco claims that Hurst did not move within the three year period set forth in the Severance Agreement, and therefore, Conopco was relieved of any liability under the Severance Agreement. Hurst cross-moves for summary judgment as to liability under the Severance Agreement.

1.   *Scope of Paragraph 11*

Conopco claims that Paragraph 11 of the Severance Agreement, which states that Unilever would reimburse Hurst for the "actual cost of [his] household move pursuant to Company policy," does not include reimbursement for brokerage fees and closing costs. Conopco contends that Paragraph 11 only provides reimbursement for ordinary moving expenses, such as packing, shipping, and transportation costs. Consequently, Conopco argues that it did not breach the Severance Agreement by refusing to pay the six percent brokerage fee that Hurst requested upon receiving the $2.4 million offer on his Stamford home. Hurst has cross-moved for summary judgment, claiming that if the Court finds that the Severance Agreement is not ambiguous, Paragraph 11 must be construed in favor of Hurst's interpretation of the provision—that it includes reimbursement of a brokerage commission and other closing costs.

Summary judgment in a contract dispute is appropriate where the language of the contract in unambiguous. See Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996). "Under New York law, whether a contract is ambiguous is a question of law for the court to resolve."[9] Argus Research Grp., Inc. v. Argus Media, Inc., 562 F. Supp. 2d 260, 268 (D. Conn. 2008). A contract is ambiguous if it, or one of its terms, is

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Sayers v. Rochester Tel. Corp., 7 F.3d 1091, 1094 (2d Cir. 1993). However, "[w]hen the relevant language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion, no ambiguity exists." Nowak, 81 F.3d at 1192 (internal quotations and alterations omitted).

Generally, parol and extrinsic evidence is not applicable to the Court's determination regarding a contract's ambiguity. See Argus, 562 F. Supp. 2d at 269. However, "[o]nce a court concludes that a . . . provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 43 (2d Cir. 2006) (internal quotations omitted); see also Constellation Power Source, Inc. v. Select Energy, Inc., 467 F. Supp. 2d 187, 209 (D. Conn. 2006).

---

[9] Paragraph 18 of the Severance Agreement provides that New York law shall govern any claim or dispute arising out of the agreement. Accordingly, New York law governs Hurst's claims. The parties do not dispute this.

Here, the Court must determine whether Paragraph 11 of the Severance Agreement as a whole, and more specifically, the terms "actual cost of your household move" and "Company policy," as used in Paragraph 11 of the Severance Agreement, are ambiguous. First, the Court finds that the phrase, "actual cost of your household move," does not unambiguously exclude moving costs such as brokerage fees or other closing costs.[10] Furthermore, that phrase cannot be read in isolation. Paragraph 11 of the Severance Agreement states that Unilever will reimburse Hurst for the "actual cost of [his] household move *pursuant to Company policy*." (emphasis added). Thus, determining what relocation costs are reimbursable under Paragraph 11 requires a determination of what "Company policy," as stated in Paragraph 11, refers to.

"Company policy" is not defined in the Severance Agreement. Although a term used in a contract does not have to be defined within the contract to be unambiguous, the use of "Company policy" in the Severance Agreement lacks specificity. "Company policy" is only used in one other paragraph of the Severance Agreement (Paragraph 10) and its use in Paragraph 10 does not help to clarify its meaning.[11] Moreover, there is no indication, based on the Severance Agreement, what policy "Company policy" actually refers to. For instance, does "Company policy" refer to a specific policy or does it refer to Unilever's past practice? Additionally, if "Company policy" refers to a specific policy, it is ambiguous which policy the Severance

---

[10] The ambiguity of Paragraph 11 is further evidenced by the specificity with which Hurst's relocation expenses were set forth in Strauss's September 1999 letter to Hurst regarding Hurst's relocation from Singapore to Stamford. For instance, rather than simply stating "actual cost of your household move," that September 1999 letter explicitly stated that it would reimburse Hurst "for the shipment of personal effects and household furnishings . . . . including all reasonable shipping, insurance, storage and delivery costs."

[11] Paragraph 10 of the Severance Agreement states: "You will be eligible for indemnification by the Company pursuant to Company policy and applicable law."

Agreement refers to—the Severance Agreement does not cross-reference a specific policy and no relocation policy was attached to the Severance Agreement for reference. Thus, the Court finds that Paragraph 11 of the Severance Agreement is subject to more than one objectively reasonable interpretation of what moving costs were intended to be covered, and is therefore ambiguous.

Because the plain meaning of Paragraph 11 of the Severance Agreement is not ascertainable from the contract itself and the term "Company policy" is ambiguous, the Court may look to extrinsic evidence to discern the parties' subjective intent. See Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987) (noting that extrinsic evidence of subjective intent is admissible if a contract term is ambiguous). "Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary." N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010) (internal quotation omitted).

Based on the evidence before the Court at this time, including the deposition testimony of Ogg, Navarra, and Hurst, the Court finds that there are genuine disputes of material facts as to the meaning of "Company policy," as used in Paragraph 11 of the Severance Agreement. For example, Ogg testified that he believed Paragraph 11 of the Severance Agreement referred to the "Relocation Guide for British International Assignees Returning to the U.K." (the "Expat Policy"), which provides reimbursement for the cost of packing and transportation, but does not provide reimbursement of a broker's commission or provide a guaranteed sales price; however, even Ogg's declaration in support of Conopco's motion for summary judgment is

contradictory—Ogg describes how the Expat Policy applies to an expatriate of the U.K. on assignment in the United States, such as Hurst, but then also refers to the applicability of a July 2007 Expat Policy, entitled, "Involuntary Termination." But, Conopco's contention that Paragraph 11 only provides reimbursement for costs such as packing and shipping, as opposed to more substantial costs such as a broker's commission, is supported by evidence of Hurst's previous relocation with Unilever. For example, when Hurst relocated from Singapore to Stamford, Unilever distinguished between "housing assistance reimbursement," which includes reimbursement for a broker's commission, and relocation expenses, which only provided reimbursement for expenses such as packing and shipping.[12]

In contrast to Ogg, Hurst testified that he believed that Paragraph 11 referred to the policy entitled, "Unilever United States Human Resources Policy Manual, Subject: Relocation and Moving Expenses, effective date May 1, 2003" (the "May 2003 Policy"), which provided reimbursement for, among other things, a broker's commission and related closing costs. The reasonableness of Hurst's belief is supported by his familiarity with Unilever's relocation policies, his prior experience with relocating from Singapore to Stamford for Unilever, and Navarra's confirmation in April 2007 that Unilever would reimburse Hurst for a six percent broker's commission.[13] While Conopco contends that the May 2003 Policy only applies to

---

[12] Strauss's September 1999 letter to Hurst separated the two types of reimbursement into different provisions.

[13] Navarra claims that he was not familiar with any of Unilever's relocation policies and only confirmed that Unilever would cover the brokerage fee after speaking with Unilever's relocation department. Additionally, Navarra claims that he sent Hurst the January 2006 Relocation Policy only after speaking with Unilever counsel or someone in Unilever's relocation department.

current employees, not terminated employees, Paragraph 11 of the Severance Agreement does not make that distinction clear. Furthermore, Conopco's claim that the only policy that "Company policy" could refer to is the Expat Policy is contradicted by the fact that the Expat Policy did not apply to Hurst when he was an expatriate being relocated from Stamford to Singapore. Additionally, the disagreement among Conopco employees as to which policy applied to Hurst's Severance Agreement is indicative of the genuine dispute of material fact that exists.[14] Therefore, the evidence shows that a reasonable jury could find Hurst's belief that "Company policy" in Paragraph 11 referred to the May 2003 Policy to be reasonable, especially given the relocation reimbursement that Unilever previously afforded Hurst.

Ascertaining what the parties actually intended Paragraph 11 of the Severance Agreement to cover requires a highly-factual inquiry involving credibility determinations. Such a determination is appropriate for the jury, not for the Court. Accordingly, the Court denies Conopco's motion for summary judgment and Hurst's cross-motion for summary judgment with respect to liability under the Severance Agreement.

### 2. *Material Breach and Timeliness*

Conopco also claims that, even if Paragraph 11 of the Severance Agreement is ambiguous, summary judgment should be granted on Hurst's breach of contract claim because Hurst did not move within the three-year time restriction contained in Paragraph 11.

Paragraph 11 unambiguously provides that Unilever was only obligated to reimburse Hurst for a relocation to the U.K. or within the U.S. "withing three years of [his] Termination

---

[14] In fact, in support of its motion for summary judgment, Conopco included three different policies as exhibits: (1) the Expat Policy; (2) the "International Assignment Policy," dated July 2007; and (3 )the "International Assignment Policy," updated June 2009.

Date." While the evidence shows that Hurst did not move within the three-year period provided for in Paragraph 11—Hurst was terminated on June 15, 2005, but did not actually move until April 2010—Hurst asserts that he was relieved from the three-year limit due to Conopco materially breaching the Severance Agreement by declining to pay the proposed brokerage fee and closing costs on the $2.4 million offer for Hurst's home in May 2007.

It is well-established under New York law that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party. See In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997). While the determination of the materiality of a breach may be an issue of law for the Court, see Int'l Gateway Exch., LLC v. W. Union Fin. Servs., 333 F. Supp. 2d 131, 143 (S.D.N.Y. 2004), "in most cases, the question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment." Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 295–96 (S.D.N.Y. 2005); see also Dopp v. Pritzker, 38 F.3d 1239, 1244 (1st Cir. 1994) ("[C]ourts and commentators have long recognized that materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances."). "Materiality goes to the essence of the contract. That is, a breach is material if it defeats the object of the parties in making the contract and deprive[s] the injured party of the benefit that it justifiably expected." ESPN, Inc. v. Office of Comm'r of Baseball, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999) (internal quotations omitted) (alterations in original); see Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997) ("Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties." (internal quotations omitted)).

Conopco contends that even if Paragraph 11 entitled Hurst to reimbursement for his brokerage fee and related closing costs, Unilever's failure to pay such costs was not material. Further, Conopco argues that Paragraph 11, as a whole, does not go to the "essence of the contract." See Int'l Gateway, 33 F. Supp. 2d at 143. Given the approximately $2.2 million lump sum payment that Hurst received under the Severance Agreement, the $200,000 in brokerage fees and closing costs that Hurst alleges he was entitled to pursuant to Paragraph 11 could be considered immaterial in the context of the entire Severance Agreement. See UASR Sys., Inc. v. Brain Works, Inc., 897 F. Supp. 163, 167–68 (S.D.N.Y. 1995) (finding that payment of twenty percent of the total price of a contract did not constitute a material braech). Nonetheless, while Hurst did receive significant compensation pursuant to the Severance Agreement in addition to any reimbursement for household moving expenses, the evidence also shows that Paragraph 11 was an important provision of the Severance Agreement to Hurst. As a citizen of the U.K. and having moved to Connecticut to work for Unilever, the evidence shows that Hurst wanted both financial security and the flexibility to move back to the U.K. or elsewhere in the U.S. In fact, there is evidence that from the outset of the parties' negotiation of the Severance Agreement, relocation costs were one of the key provisions of Hurst's severance— Hurst included relocation costs as one of the proposed terms in his November 14, 2004 letter to van Heemstra, and Hurst explicitly negotiated to expand the geographical scope of Paragraph 11.[15] Thus, if the jury finds that Paragraph 11 includes reimbursement for brokerage fees and other closing costs, there

---

[15] Also, in a July 16, 2007, email to Patrick Cescau at Unilever, Hurst described the relocation provision as "an especially important component of the [severance] agreement." In that letter, Hurst cited his employment search and his children's schooling requirements as the reasons for the importance of the relocation reimbursement.

remains a genuine dispute of material fact as to whether Unilever's refusal to pay the proposed fees from the $2.4 million offer on Hurst's home constitutes a material breach of the Severance Agreement, thereby relieving Hurst of the three-year time limit.

      C.      <u>Breach of the Covenant of Good Faith and Fair Dealing</u>

"Under New York law, breach of the implied duty of good faith and fair dealing 'is merely a breach of the underlying contract.'" <u>Underdog Trucking, LLC v. Verizon Servs. Corp.</u>, No. 09 Civ. 8918, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010) (quoting <u>Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank</u>, 392 F.3d 520, 525 (2d Cir. 2004)). Thus, New York courts have held that a cause of action for the breach of the implied covenant of good faith and fair dealing is "duplicative" of a cause of action for breach of contract, and therefore should be dismissed when both claims are brought in the same suit. <u>See, e.g.</u>, <u>N.Y. Univ. v. Cont'l Ins. Co.</u>, 87 N.Y. 2d 308, 320 (1995); <u>see also</u> <u>Harris v. Provident Life & Accident Ins. Co.</u>, 310 F.3d 73, 81 (2d Cir. 2002) (stating that New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled").

In Count Two of Hurst's Amended Complaint, Hurst claims that Conopco breached the covenant of good faith and fair dealing by refusing to pay the six percent realtor commission on the sale of his Stamford home. Conopco contends, and the Court agrees, that both Hurst's breach of contract claim and claim for breach of the implied covenant of good faith and fair dealing arise from the same set of facts and allegations. Accordingly, Hurst's claim for the breach of the

covenant of good faith and fair dealings is duplicative of his breach of contract claim and Conopco's motion for summary judgment as to Count Two is granted.[16]

D. Damages

   1. Mitigation of Damages

In its Fifth Affirmative Defense, Conopco claims that, even if it is ultimately found liable for breach of contract, Hurst was under a duty to mitigate his damages and failed to do so.

The plaintiff in a breach of contract action typically has a duty to mitigate any damage that he incurs as a result of the breach. See U.S. Bank Nat'l Ass'n v. Ables & Hall Builders, 696 F. Supp. 2d 428, 440 (S.D.N.Y. 2010). "This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." Id.

After declining the $2.4 million firm offer on his Stamford home in May 2007 (because Unilever would not agree to reimburse Hurst for his broker's fee), Hurst sold his home for $1.7 million in April 2010. Thus, Hurst seeks the decline in the sale price of his home as part of his damages in this action.

Conopco asserts that, regardless of whether Unilever agreed to reimburse him for his broker's fee and closing costs, Hurst should have accepted the $2.4 million firm offer and then sued Conopco for any alleged breach of contract concerning the broker's fee. Additionally, Conopco argues that by taking his house off the market in October 2007 and waiting to re-list the home in April 2008, Hurst failed to mitigate his damages, especially given the collapse of the housing market in 2008 and 2009. The evidence shows that Hurst likely had the financial ability

---

[16] At oral argument, Hurst agreed that his claim for the breach of the covenant of good faith and fair dealing was duplicative of his breach of contract claim and does not oppose Conopco's motion for summary judgment as to Count Two.

to pay the approximately $200,000 broker's commission and closing costs on the $2.4 million offer. Therefore, Hurst likely could have accepted the $2.4 million offer on his home, despite Conopco's refusal to reimburse him for the fees, and subsequently pursued his breach of contract claim. Nonetheless, the Court finds that there is a genuine dispute of material fact as to whether the damages could have been reasonably avoided. First, at the time Hurst declined the $2.4 million offer, the evidence indicates that Hurst did not know nor could he have reasonably expected that the housing market would soon decline in such a dramatic manner. In fact, had the sale price of Hurst's home increased after he rejected the $2.4 million offer, mitigation of damages would not be at issue. Further, the evidence shows that Waterman had personal health troubles in 2007, which influenced the couple's decision to take their house off of the market at that time.

Given that mitigation of damages requires the balancing of Hurst's reasonable effort and undue risk, burden, or expense, the Court finds that there is a genuine dispute of material fact as to whether Hurst could have reasonably mitigated his damages. Accordingly, Conopco's partial motion for summary judgment as to the mitigation of damages is denied.

### 2. *Consequential Damages*

Finally, Conopco claims that Hurst's damages should be limited to general damages and therefore Hurst should be precluded from receiving consequential damages. Specifically, Conopco argues that Hurst should not be able to recover damages for the loss of value in his home resulting from the difference in the $2.4 million offer, which Hurst rejected, and the eventual $1.7 million sale price.

New York courts have held that in a breach of contract action, general damages are the norm and consequential damages are the exception. See Kenford Co. v. Cnty. of Erie, 73 N.Y.2d 312, 319–21 (1989). Consequential damages should only be awarded where the parties contemplated such damages at the time they entered into the contract. See id. In other words, consequential damages must have been foreseeable to be recoverable.

The determination of whether the parties contemplated damages caused by the loss of value in Hurt's home is, at least in part, dependent on the scope of Paragraph 11 of the Severance Agreement. Although it is generally foreseeable that home prices are volatile and that there is a risk of decline in home value, the evidence shows that it was not likely foreseeable to either party when the parties signed the Severance Agreement that the housing market would collapse in such a dramatic fashion. Thus, if the jury finds that the parties intended Paragraph 11 to include reimbursement for the loss in value of Hurst's home (a guarantee that Hurst was previously afforded by Strauss), then it would appear that the parties contemplated and foresaw these damages. If, however, the jury finds that no such guarantee was contracted for, then damages for the loss in value of Hurts's home were likely not contemplated by the parties. Because the Court has found that genuine disputes of material facts preclude the Court from ascertaining the scope of Paragraph 11 of the Severance Agreement at this time, the Court denies Conopco's partial motion for summary judgment as to consequential damages without prejudice.

### III. Conclusion

Accordingly, the defendant's motion for summary judgment [Dkt # 63] is GRANTED IN PART and DENIED IN PART, and the plaintiff's partial motion for summary judgment is DENIED.

SO ORDERED this <u>5th</u> day of July 2011, at Hartford, Connecticut.

<u>/s/ Christopher F. Droney</u>
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**